Filed 1/31/23  HWA 555 Owners v. RGN-San Francisco XXIV CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| HWA 555 OWNERS, LLC,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RGN-SAN FRANCISCO XXIV, LLC et al.,<br><br>        Defendants and Appellants. | A163137<br><br>(San Francisco City & County Super. Ct. No. CGC-19-580236) |

Both parties to this litigation are extremely sophisticated real estate companies.  Defendants RGN-San Francisco XXIV, LLC and Regus, PLC (collectively, Regus) entered a contract with plaintiff HWA 555 Owners, LLC (Vornado) to lease a five-story commercial space in downtown San Francisco. An important condition of the parties' agreement required that Regus be allowed to post prominent rooftop signs on three sides of the building. Accordingly, the parties negotiated language drafted specifically for the transaction allowing Regus to terminate the lease agreement if it did not obtain "necessary governmental approvals and permits" for its signage.

Due to the importance of the signage to Regus, Regus and Vornado met with staff from the San Francisco Planning Department (Planning Department or the City) before they executed the lease agreement and obtained informal, preliminary approval from Planning Department staff

members for the proposed signage.  After the contract was signed, Regus filed a permit application with the Planning Department.  Planning Department staff did not approve the application immediately, and over the course of several months made suggestions, requests for changes, and comments to Regus, Vornado, and their agents about the signage for the building.  In September 2019, Regus sent a notice of termination to Vornado stating it was exercising its right to terminate the lease because the signage included in the lease agreement had not been approved and had been rejected by the Planning Department.  The same day Vornado received the notice of termination, the Planning Department approved the signage.

Vornado sued Regus for declaratory relief, breach of the lease agreement, breach of the covenant of good faith and fair dealing, and breach of guarantee, asserting that Regus's notice of termination was null and void under the terms of the parties' agreement, and that Regus had therefore unlawfully breached the lease.

Following a bench trial, the San Francisco Superior Court ruled in favor of Vornado.  In a detailed and comprehensive statement of decision, the court set forth its findings of fact and conclusions of law, determining that Regus's notice of termination was invalid under section 43(A) of the lease agreement and Vornado was entitled to judgment in its favor.

On appeal, Regus asserts the trial court improperly reformed rather than interpreted the agreement by supplying words never intended by the parties.  Alternatively, Regus contends, the trial court erroneously interpreted the agreement.  For reasons we explain below, we disagree and will affirm.

2

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. *The Lease*

In December 2017, Regus and Vornado began discussions regarding lease of a commercial property in downtown San Francisco. The building, located at 345 Montgomery Street, at the corner of Montgomery and California Street in the Financial District, is owned by Vornado. Under the terms of the lease, Regus would rent the entire building for 15 years 7 months, for over $90 million in total base rent. In the lease negotiations, Regus made clear to Vornado that a critical consideration for Regus in agreeing to lease the building was Regus's ability to place large signs with the name "Spaces" on the top of three specific sides of the building, which the parties referred to as the "Three Crown Signage" (signage or Three Crown Signage).

The Planning Department had to approve a signage building permit application before the San Francisco Department of Building Inspection would issue a building permit. To facilitate Regus's desire for the signage, representatives for the parties met with two representatives of the Planning Department, including a supervisor, on June 8, 2018. Vornado planned to explain the desired signage to the Planning Department representatives and receive their feedback on whether it would be approved. The parties agree that at the meeting, the Planning Department gave "preliminary approval" for the signage. As explained by Vornado's project manager, the Planning Department gave a "verbal sign off."

Prior to this meeting, the parties had prepared a draft lease, but the draft did not include any substantive language about the signage. After the preliminary approval meeting, on June 29, 2018, Vornado sent a revised draft of the lease to Regus with proposed language about signage. The new

3

language, contained in section 43(A), was drafted by Vornado's outside counsel. Regus, who was also represented by counsel in negotiating the lease, did not request any changes to the language prepared by Vornado's counsel, nor were any changes made to that language before the lease was signed.

The parties signed the final lease agreement effective July 24, 2018. The introductory paragraph to section 43 provides that Regus "shall be entitled to install three (3) rooftop signs . . . as shown on **Exhibit F**." Section 43(A), entitled "**Tenant's Signage Specifications and Permits**," states, in relevant part, as follows: "Tenant's Signage shall be subject to Tenant's receipt of all required governmental permits and approvals and shall be subject to all Applicable Law and to any covenants, conditions and restrictions affecting the Project. Landlord, at no out-of-pocket cost to Landlord, shall use commercially reasonable efforts to assist Tenant in obtaining all necessary governmental permits and approvals for Tenant's Signage. Landlord and Tenant hereby acknowledge that Tenant's Signage has received preliminary approval from the city of San Francisco. Notwithstanding the foregoing, in the event the Sign Specifications are materially consistent with Exhibit F and Tenant does not receive the necessary governmental approvals and permits for Tenant's Signage on or before the Delivery Date, then the sole remedy of Tenant for such failure shall be the right to deliver a notice to Landlord (a "**Signage Rejection Termination Notice**") electing to terminate this Lease effective upon the date such Signage Rejection Termination Notice is received by Landlord. The Termination Notice must be delivered by Tenant to Landlord, if at all, following Tenant's rejection of the necessary governmental approvals and permits for Tenant's Signage, but no later than the Delivery Date. . . .

Tenant's rights to terminate this Lease, as set forth in this Section 43(A), shall be Tenant's sole and exclusive remedy at law or in equity for the failure of Tenant to receive the necessary governmental approvals and permits for Tenant's Signage."

Other relevant provisions of the lease stated (1) the "Delivery Date" is the date Vornado delivered possession of the building to Regus (Delivery Date), which was anticipated to be September 30, 2019; (2) any notice Regus was required to give under the lease was effective upon receipt by Vornado; (3) the lease and rights and obligations of the parties "shall be governed, interpreted, construed and enforced in accordance with the laws of the State of California"; and (4) Vornado was to do improvement work on the building before delivering possession to Regus—if Vornado had not delivered the premises by September 29, 2021, Regus could terminate the lease on 10 days' notice.

## B. *The Permit Application and Communications with Planning Department*

Regus retained a national signage vendor, Jones Sign, to prepare and submit the permit application for the signage to the Planning Department. Jones Sign began work on the application in mid-March 2019, about eight months after the lease was signed.

In April 2019, a Jones Sign permit administrator sent an e-mail to Jonathan Vimr at the Planning Department, seeking to confirm the proposed signage would be acceptable "when we come in for permits." Vimr, who had attended the preliminary approval meeting before the lease agreement was executed, responded that the proposal was "both code compliant and an appropriate approach for this historic property." Vimr noted the "only comment" was that Jones Sign should bring a material sample along with its plans, and "[w]ith said sample brought along, this proposal is all set."

5

In June 2019, Jones Sign submitted a permit application for the signage at the counter of the Planning Department. The planner who staffed the counter that day, Justin Greving, had not attended the preliminary approval meeting and was not aware there had been any prior Planning Department involvement with the signage. Greving had concerns about whether the permit application should be approved, so he did not approve it at the counter. Thereafter, the application was handled by the Planning Department through a process which allowed for input from a variety of Planning Department personnel.

Over the course of the next two months, various Planning Department personnel made suggestions, requests for changes, and comments to Regus, Vornado, and their agents about the signage for the building. These included comments that the signage was not appropriate for the building because it "[did] not meet [applicable] signage guidelines" and needed to "be located/sized akin to the previous Bank of America signs on the building." According to Planning Department staff, the suggestions, requests, and comments made during this time were typical of negotiations that the Planning Department had with applicants for building permits requiring approval.

In July 2019, Ashley Fehlman, the project manager for Regus at Jones Sign, sent the Vornado project manager, Taylor Ott, an e-mail describing concerns expressed by Greving at the Planning Department about the size, quantity, and location of signs included in the permit application. Ott was frustrated that Regus had not sought approval from Vimr, who had attended the preliminary approval meeting. Ott told Jones Sign and its agents to cease communications with the Planning Department and allow Vornado and its agents to handle those communications. By this time, Vornado's local real

estate counsel had been alerted to the suggestions and comments made by the Planning Department, and had initiated contact with the Planning Department to obtain approval for the permit application.

In late August, Vornado's attorney, James Reuben, spoke with John Rahaim, the director of the Planning Department, who had authority to overrule the signage recommendation of other Planning Department personnel and to approve a permit application. Reuben told Rahaim about the June 8, 2018 preliminary approval meeting and the inclusion in the lease of the signage that Vornado and Regus understood had been approved at that meeting. By August 30, 2019, Rahaim had decided that if Regus and Vornado were unwilling to accept alternatives for the signage, the Planning Department would approve the permit application. In an internal e-mail, Rahaim wrote: "if we signed off, it's a done deal." Around this time, Rahaim told Vornado's counsel that the Planning Department would adhere to its prior preliminary approval of the signage.

Even after August 30, however, Planning Department staff continued to negotiate with representatives of Regus and Vornado to achieve a compromise that would involve rooftop signage on only two sides of the building. Concerned about the comments by the Planning Department and unaware of Rahaim's decision to approve the permit application if a compromise could not be reached, Paul Heinen, senior vice-president of leasing at Vornado, reached out to Michael Berretta, his counterpart at Regus. In a September 10 e-mail, Heinen said, "[W]e need to speak about a re-trade from the SF Planning Department regarding the signage at 345 Montgomery." Heinen was referring to the possibility that Regus would accept signage for the building that did not include all three rooftop signs depicted in exhibit F to the lease.

7

After speaking with Berretta, Heinen sent a follow-up e-mail on September 11.  Heinen wrote:  "As I mentioned, the Planning Department has stated that it no longer is willing to allow the sign facing the plaza, but will allow the signs facing California and Montgomery."  A few minutes later, Glen Weiss, a more senior executive vice-president, wrote to Berretta:  "We too are shocked by this circumstance—unfortunately  the signage vendor went directly to City Planning without speaking to anyone on your team, or ours, about our collaborative deal with the planning department. [¶] You may recall one of your RE team members joined Paul and me in person at the planning department for the then formal approval meeting at which time approval was granted. [¶] The issue is the Spaces signage package was submitted to the City by the signage vendor but to the wrong people who had zero knowledge of the approved deal. [¶] We are alternatively thinking hard on ideas to get you branding on the Plaza side of the project so passerbys [*sic*] see your brand here in addition to the two definitively approved signs. [¶] We want this to work as much as you do and are here 24/7 to figure it out."  Two days later, Berretta thanked Weiss and said he would be in touch.

On September 17, 2019, Weiss wrote to Berretta that "[a]s an update the City Planning Director approved Spaces signage above the front door at the Plaza."  Berretta responded:  "Please send the final approved today vs what the lease dictated so I can send through on our side when you can."  The next day, Weiss responded that Vornado had contacted the Planning Department director and something short of three rooftop signs " 'has been formally approved by the Director.' "

A few days earlier, on September 13, 2019, and unbeknownst to Vornado, Regus began asking representatives of Jones Sign about rejection of

the permit application for the signage.[1]  That day, the Regus project manager, Candace George, e-mailed Fehlman at Jones Sign asking, "Do you know how many rejections we have had from the City?  What has been the nature of the rejections?"  She also asked Jones Sign not to tell Taylor Ott or Vornado "that this is an issue."

Three days later, Fehlman responded to George stating that Jones Sign had "received some unofficial feedback from the city around June 25 that the sizes and quantities of the signs may be an issue" and indicating that Jones Sign had "continued to push back to the city with the understanding that we had pre-approval of the sign package."  Fehlman described exchanges with the Planning Department in July and informed George that Taylor Ott had asked Jones Sign to stop communicating with the Planning Department in August.  In response, George asked for e-mails from the City and told Fehlman to "stop work on the redesign" and not provide an update to Ott.  Fehlman subsequently sent e-mails to George and her supervisor, Te'Andre Sistrunk, a senior director at Regus, which she described as "emails we have received from the city denying the signage," explaining that Vornado was "trying to rectify the issues with the city."  After receiving the e-mails from Fehlman, Sistrunk responded, asking, "Is this all they give or do they give an official rejection letter/drawings stamped[?]"  Fehlman responded, "This is all we received to date from the city," and suggested her knowledge may not be current because on August 15, Vornado had "asked us to stop our

---

[1] The trial court made a factual finding that Regus's approach to the permit application changed about this time, a finding which Regus does not challenge on appeal.  Although Vornado points us to evidence in the record suggesting that Regus discovered the lease would be unprofitable around this time, we do not discuss that evidence as it is unnecessary to the resolution of this appeal.

communications direct with the city." Sistrunk then asked Fehlman to contact the City and "have them give us an official rejection if that is what their protocol is." Fehlman responded she would work on "getting the official rejection" and understood the request to be "asking for a copy of something 'official.' " Less than two hours later, Sistrunk again e-mailed Fehlman, asking for, among other things, the "Denial letter of application" and a "summary of what [Vornado] is doing with the city now that it has been rejected." Sistrunk then continued to follow up with Fehlman, emphasizing that Regus's attorney was asking urgently for information about rejection of the permits.

On September 20, Fehlman e-mailed Sistrunk and George again to confirm Jones Sign was "trying to have the city issue an official denial letter for you." Fehlman wrote that she obtained and attached "the intake report from the city . . . . [which] shows the signage has not progressed since the initial submittal." She added that she understood "how urgently you need this information" and that Jones Sign was "diligently" working on obtaining it.

Despite these attempts by Jones Sign and its local agents to obtain a formal denial of the signage permit application, no formal denial letter was issued. Rather, on September 23, 2019, Jeff Joslin of the Planning Department sent an e-mail to Reuben, stating, "[W]e're getting a request from the sign company for some kind of determination of denial, and that's not where we're at." The next day, Jones Sign reached out to Greving, asking if he could advise "whether you would even be able to provide me a formal denial letter" because Regus was "really pushing . . . to try and track this down." Greving recommended Jones Sign follow up with Joslin.

## C. *The Termination Notice*

On September 25, 2019, Regus's chief executive officer, Mark Dixon, decided to terminate the lease. Regus sent Vornado a letter, designated a "Signage Rejection Termination Notice" (termination notice). After noting terms in the letter had the meaning provided in the lease, the letter stated that Regus "has not received the necessary governmental approvals and permits for [Regus's] Signage; rather, the applicable governmental authorities have rejected [Regus's] request for the approval of [Regus's] Signage. Under the terms of Section 43(A) of the Lease, [Regus] has the right to terminate the Lease." The letter was received by Vornado the following day, September 26, 2019.

That day, Weiss wrote to Berretta: "We have not formally advised you per the lease that the Signs are rejected. [¶] We are trying to work it out as per my emails to you." He added in another e-mail, "Nor has the City sent a rejection notice." Berretta responded: "Based on emails and conversations with you and your team, in addition to your requests for us to accommodate alternate signage plans, it is our position that Sign Specifications attached to the lease have been rejected by the City. We do not intend to withdraw the provided termination notice as a result. As you know, getting the signage per the lease was very important to us, which is why we insisted on this termination right. This should not come as a surprise and we are obviously disappointed in this outcome."

## D. *Permit Approval*

On September 25, 2019, the same day Regus sent the termination notice, Regus's local sign vendor e-mailed Fehlman at Jones Sign that despite efforts to obtain one, "We do not have a formal denial letter." The next day, the day Vornado received the termination notice, Jones Sign e-mailed Joslin

11

at the Planning Department requesting "a formal denial letter that lists the deficient items so we can work toward a resolution." Joslin responded: "This is a miscommunication on the part of your team. There is no denial to be issued. However, there is a reconfiguration of the sign approach for the elevation facing the plaza."

When it received the termination notice, Vornado forwarded the notice to its attorney, Reuben, who in turn forwarded it to Rahaim at the Planning Department. Before the end of the day, Rahaim determined the Planning Department would approve the signage permit application without any change or modification. Rahaim decided to approve the permit application because he realized that Regus would not accept any signage other than the Three Crown Signage.[2] At this point, the Planning Department gave up its efforts to negotiate different signage. By the end of the day, Joslin e-mailed Jones Sign again, noting the "negotiation took another turn, and the signs as originally acknowledged as acceptable are now approved."

Thereafter, Vornado withdrew Regus's permit application and resubmitted an application for the signage. The application was approved and a permit for the signage was issued on October 2, 2019. After it was notified of the approval, Regus refused to withdraw its termination notice.

### E. The Lawsuit

Vornado filed suit against Regus, asserting causes of action for (1) declaratory relief, (2) breach of the lease, (3) breach of the covenant of good faith and fair dealing, and (4) breach of a guarantee. The complaint sought a declaration that Regus's termination notice was "null and void"

---

[2] According to Joslin and Rahaim, Regus never told the Planning Department at any time before it sent the termination notice that it would not accept alternative signage.

12

because the signage was not rejected and/or the signage was approved and the Department of Building Inspection issued a permit before the Delivery Date. Before trial, Vornado dismissed without prejudice all causes of action except the one seeking declaratory relief.

## F. *The Bench Trial and Statement of Decision*

The case proceeded to a bench trial beginning on November 30, 2020. Six witnesses testified live (via Zoom) over the course of three days and the parties designated portions of the depositions of eight witnesses as trial testimony. The court issued a tentative decision that the termination notice breached the lease, which it reaffirmed in an e-mail to the parties on December 22, 2020, after it completed review of all of the deposition designations and admitted exhibits.

Following the parties' requests for a statement of decision and a further hearing, the trial court completed another "full review of the evidence and the parties' arguments." The court then issued a detailed, 43-page statement of decision, setting forth its factual findings and legal conclusions entitling Vornado to relief on its complaint.

The trial court first determined the language of the contract was ambiguous. Then, after analyzing five principles of contract interpretation, the trial court construed section 43(A) of the lease to provide that "Regus had the right to send a termination notice if and only if the [Three Crown Signage] permit had not been issued as of the Delivery Date or any material part of the permit application had been formally and definitively disapproved by the City (by notation on the application and/or a written notice of disapproval) before the Delivery Date." (Boldface omitted.) The court next determined that Regus's termination notice breached the lease because neither of the conditions permitting Regus to send a termination notice were

13

met.  Finally, it rejected Regus's argument that Vornado was equitably estopped from obtaining a declaration that the termination notice is null and void.  The court entered judgment for Vornado and a costs award of $99,158.61.

## II.  DISCUSSION

The sole issue on appeal is whether the trial court correctly interpreted two provisions of section 43(A) of the parties' contract.  Regus contends the trial court erred because it reformed, rather than interpreted the lease agreement, by supplying words and effectively rewriting the parties' agreement.  Regus further asserts that even if the trial court merely interpreted the agreement, it erred in doing so because it misapplied principles of contractual interpretation.

### A.  *Standard of Review*

The parties disagree about the appropriate standard of review.  Regus contends we must review the interpretation of the lease de novo; Vornado contends we must apply a substantial evidence standard of review because the trial court considered extrinsic evidence and made factual findings.

"When an appellant challenges a trial court's interpretation of a written contract, the substantial evidence standard of review applies when the contract is ambiguous and conflicting extrinsic evidence is admitted to assist the court in interpreting the contract.  [Citation.]  However, if interpretation of the contract does not turn on the credibility of conflicting extrinsic evidence, the trial court's interpretation of the contract is a question of law we review de novo, or independently."  (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1110; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 (*Parsons*); *ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266–1267 [appellate

14

court reviews a contract and extrinsic evidence de novo, even if the evidence is susceptible to multiple interpretations, unless the interpretation depends on credibility].) Because the trial court's interpretation of the parties' agreement here did not depend on *conflicting* extrinsic evidence, we must independently review the provisions of the lease agreement.

## B. Interpretation of the Lease

Our goal in interpreting a written agreement is to give effect to the parties' mutual intent at the time of contracting. (Civ. Code, § 1636; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; *Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 21 ["The precise meaning of any contract, including a lease, depends upon the parties' expressed intent, using an objective standard."].) To the extent possible, that intent is to be inferred from the language of the written contract alone. (Civ. Code, § 1639.) However, "[e]xtrinsic evidence is admissible to prove a meaning to which the contract is reasonably susceptible." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 (*Founding Members*).) Further, "California recognizes the objective theory of contracts [citation], under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation' [citation]. The parties' undisclosed intent or understanding is irrelevant to contract interpretation." (*Id.* at p. 956.)

### 1. The Contract Language

We begin with the language of the parties' agreement. The parties disagree about the meaning of the sixth and seventh sentences of section 43(A) of the lease as they relate to Regus's right to terminate the contract. Because additional language in section 43(A) is important to our

15

interpretation, we will quote relevant provisions and italicize the sixth and seventh sentences of that section.

Section 43(A), entitled "**Tenant's Signage Specifications and Permits**," provides in relevant part: "Tenant's Signage shall be subject to Tenant's receipt of all required governmental permits and approvals and shall be subject to all Applicable Law and to any covenants, conditions and restrictions affecting the Project. Landlord, at no out-of-pocket cost to Landlord, shall use commercially reasonable efforts to assist Tenant in obtaining all necessary governmental permits and approvals for Tenant's Signage. Landlord and Tenant hereby acknowledge that Tenant's Signage has received preliminary approval from the city of San Francisco. *Notwithstanding the foregoing, in the event the Sign Specifications are materially consistent with Exhibit F and Tenant does not receive the necessary governmental approvals and permits for Tenant's Signage on or before the Delivery Date, then the sole remedy of Tenant for such failure shall be the right to deliver a notice to Landlord (a "Signage Rejection Termination Notice") electing to terminate this Lease effective upon the date such Signage Rejection Termination Notice is received by Landlord. The Termination Notice must be delivered by Tenant to Landlord, if at all, following Tenant's rejection of the necessary governmental approvals and permits for Tenant's Signage, but no later than the Delivery Date.* . . . Tenant's rights to terminate this Lease, as set forth in this Section 43(A), shall be Tenant's sole and exclusive remedy at law or in equity for the failure of Tenant to receive the necessary governmental approvals and permits for Tenant's Signage." (Italics added.)

"The threshold question is whether the contract is ambiguous—that is, reasonably susceptible to more than one interpretation." (*Scheenstra v.*

16

*California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 389.) The question of ambiguity is a question of law for the court. (*Ibid*.)

Here, as the trial court observed, there is a facial ambiguity present in the plain language of the sixth and seventh sentences because they both employ the term "necessary governmental approvals and permits" as a triggering condition. The sixth sentence provides that Regus may deliver a termination notice if Regus fails to receive the "necessary governmental approvals and permits" on or before the Delivery Date, while the seventh sentence provides the termination notice must be delivered only after Regus's rejection of the "necessary governmental approvals and permits," but no later than the Delivery Date. As the trial court explained, "In common parlance, a party cannot reject something until that something has been offered to it. Therefore, per common parlance, the sixth and seventh sentences are irreconcilable because it is not possible for Regus to satisfy the two conditions required for it to serve a Termination Notice: first failing to receive the necessary approval and permits, and second rejecting the necessary approvals and permits." Because Regus would not be able to reject approvals and permits it had never received, the meaning of the contract is not clear on its face.

Further, as all parties seem to agree on appeal, the language in the seventh sentence requiring Regus to send the termination notice "following *Tenant's* rejection of the necessary governmental approvals and permits" is uncertain and illogical because it is the Planning Department, not Regus as the tenant, that would reject "the necessary governmental approvals and

17

permits." (Italics added.) Regus was applying for the permit; it does not make sense that it would reject its own application.[3]

In addition, while Regus contends the sixth sentence is unambiguous because it clearly allows Regus to deliver a termination notice if it has not received "the necessary governmental approvals and permits" *either* on *or* before the Delivery Date, the sixth sentence defines that notice as a "*Signage Rejection* Termination Notice."[4] (Italics added.) In fact, the sixth sentence *twice* refers to the "*Signage Rejection* Termination Notice," which the seventh sentence explains may be delivered only, "if at all," after *rejection* of the necessary approvals and permits. (Italics added.) On its face, the sixth sentence arguably dictates *under what conditions* Regus may send a termination notice (i.e., in the event the signage is consistent with exhibit F and Regus does not receive the approvals and permits on or before the Delivery Date), while the seventh sentence states *when*, "if at all," the notice may be sent (i.e., following rejection of the permits). Read together, however,

---

[3] On appeal, Regus repeatedly acknowledges that the language in the seventh sentence referring to "*Tenant's* rejection of the necessary governmental approvals and permits" is "insensible." (Italics added.) Moreover, Berretta, Regus's lead negotiator for the lease agreement, affirmed at trial that Regus and Vornado were working together to obtain the signage permit, the point of the agreement was to obtain approval on the signage application, there was never any thought that Regus would reject a signage approval from the City, and Regus rejecting the signage as agreed "wouldn't make sense." The trial court also found Regus did not request that a contractual right to reject the City's approval of its permit be included in the lease. Regus's termination notice also appears to acknowledge the mutual intent of the parties that it is the City who would reject the permits, not Regus, as it states "the applicable governmental authorities have rejected [Regus's] request" for approval of its signage.

[4] We note no party on appeal, nor the trial court, addressed the ambiguity arising from the fact that the termination notice is defined as a "Signage *Rejection* Termination Notice" in the sixth sentence. (Italics added.)

18

it is unclear whether the sixth and seventh sentences permit Regus to terminate the contract any time before the Delivery Date if it merely has not received approval for the permits, or if it may only terminate the lease prior to the Delivery Date *after* rejection of the permits.

Finally, as Vornado points out, Regus has taken multiple different positions regarding the meaning of the seventh sentence at trial and on appeal. At trial, for example, Regus argued that the language in the seventh sentence regarding "Tenant's rejection" of approvals and permits referred to "*Regus's right to reject* any governmental approval of signage specifications that deviated from those that the parties carefully negotiated."[5] (Boldface omitted.) On appeal, Regus argues the trial court should have disregarded these "insensible" words in the seventh sentence. And in both the trial court and this court, Regus argues that alternatively, if we construe the clause as requiring "the City's" rejection of "the necessary governmental approvals and permits," then the feedback from the Planning Department communicated by Vornado and Regus's agents to Regus constituted a rejection of the signage contained in the lease. These multiple possible interpretations further support a finding that the plain language of the parties' contract is ambiguous. (See, e.g., *Allstate Ins. Co. v. Condon* (1988) 198 Cal.App.3d 148, 152 [multiple interpretations advanced by litigant regarding ownership served to highlight the ambiguity of term " 'non-owned' "].) Having determined the sixth and seventh sentences are ambiguous, we now address their proper interpretation.

---

[5] Indeed, in the trial court, Regus asserted this was "unambiguous" language, while on appeal, as noted above, it concedes the language is "insensible."

19

### 2. *Extrinsic Evidence*

Extrinsic evidence is admissible to prove a meaning to which the contract is reasonably susceptible. (Code Civ. Proc., § 1856, subd. (g); *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126.) Where that evidence is not in conflict, we independently construe the contract.[6] (*Wolf*, at pp. 1126–1127; *Parsons, supra,* 62 Cal.2d at pp. 865–866; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166 (*Winet*).) After reviewing the evidence admitted at trial, we conclude it supports Vornado's interpretation of the contract—that Regus could only terminate the lease if (1) it had not yet received approval for the signage permit *by* the Delivery Date (Delivery Date Condition, sixth sentence), or (2) after the City had formally and definitively rejected the permit application in writing (Rejection Condition, seventh sentence).

First, we turn to the circumstances surrounding the making of the agreement. (Civ. Code, § 1647 ["A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."].) "We are instructed to consider parol evidence of the circumstances which attended the making of the agreement, ' ". . . including the object, nature, and subject matter of the writing . . ." so that the court can "place itself in the same situation in which the parties found themselves at the time of contracting. " ' " (*Winet, supra,* 4 Cal.App.4th at p. 1168, quoting *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40.) The general subject matter of section 43(A) is the signage, which Regus insisted was critical to its agreement to lease the building. In fact the signage was so important that during negotiations, the parties, both of whom were

---

[6] Regus raises no argument on appeal that the trial court improperly admitted any of the extrinsic evidence.

represented by counsel, met to obtain preliminary approval of the signage from representatives of the Planning Department on June 8, 2018. The parties' draft agreement stated that language regarding the signage was " 'to be provided once approved by the City.' "

After receiving a " 'verbal sign off' " from the City on the proposed signage, the parties included in their agreement the section 43(A) language drafted by Vornado's outside counsel, which Regus's counsel accepted without change. That language, in the fifth sentence of section 43(A), acknowledges the "preliminary approval" the parties had already received, but states, in the sixth sentence, that "[n]otwithstanding" *that* approval, Regus could terminate the lease if it did not receive approval for its signage. The evidence of the parties' actions while negotiating the lease when read against the language of the agreement itself shows their mutual understanding that their rights and obligations under the lease depended on something more than the oral advice and " 'verbal sign off' " they received from the Planning Department at the June 8, 2018 meeting. Rather, it reflects that notwithstanding that "preliminary" or "informal" approval, the parties agreed Regus would need a formal decision from the City on its permit application.

In addition, the undisputed evidence regarding what the parties did and did not say to each other during the contract negotiations about Regus's rights with respect to signage is persuasive evidence regarding the meaning of the Delivery Date Condition. Both parties to this agreement were sophisticated real estate companies, independently represented in the negotiations by counsel, with equal bargaining power. Yet there was no testimony that Regus sought an effectively unilateral option to terminate the lease at any time before it received formal approval of its signage. To the contrary, Regus's own lead negotiator, Michael Berretta, affirmed that the

21

signage was not a type of "option" under the lease. When he summarized for the trial court the nature of all of his communications with Vornado regarding the termination right during the negotiation of the lease, Berretta explained the importance of the signage to Regus and emphasized the need to obtain signage consistent with that presented at the preliminary approval meeting. He also acknowledged how important the termination right was to the parties, stating: "[G]iving a termination right in a lease is paramount to—I mean, it is equal to nothing from a landlord's perspective." But despite the recognized importance of that right, he did not testify that Regus requested a right to terminate the lease *at any point* before the Delivery Date if approval had not yet been obtained.

Rather, the evidence regarding the parties' negotiations showed, as the trial court found, that "Up to and including the time that the parties entered into the Lease, the only concern that Regus expressed regarding the Three Crown Signage is that it needed a permit for the signage by the time it took possession of the Building. . . . During that time Regus did not express any need or reason for it to have the permit prior to it's [*sic*] taking possession of the Building. . . . Nor did Regus identify any such need or reason at any time prior to sending the Termination Notice." Taken together, all of this evidence regarding the circumstances surrounding the making of the agreement supports a reading of the Delivery Date Condition in the sixth sentence that provides Regus a right to terminate the lease only if it had not received formal approval of its permit application *by* or *as of* the Delivery Date, rather than *at any time* before it received approval of the permit.

In addition to surrounding circumstances, courts may consider acts of the parties subsequent to the execution of the contract and before a controversy has arisen to determine the meaning of the contract. (*Crestview*

22

*Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 753 [" 'The acts of the parties under the contract afford one of the most reliable means of arriving at their intention; and, while not conclusive, the construction thus given to a contract by the parties before any controversy has arisen as to its meaning will, when reasonable, be adopted and enforced by the courts.' "]; *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 393 [evidence of party's conduct occurring between execution of contract and dispute about its meaning is admissible to resolve ambiguities in contractual language].) Here, the parties' actions after they signed the agreement suggest that Regus did not have a right to terminate the agreement at any time simply because it had not received approval from the Planning Department.

First, as the trial court recognized, the fact that Regus did not start work on the permit application until eight months after the effective date of the lease, and did not submit the application until three months later, supports an inference that Regus did not need to have the permit approval before the Delivery Date. In addition, Vornado agreed to, and did, spend "Upwards of $50 million" on building improvements pursuant to the lease agreement prior to the Delivery Date. This evidence of substantial effort and expense on Vornado's part in anticipation of Regus's occupancy suggests the parties did not intend that Regus would have a unilateral right to terminate the lease agreement at any time before the Delivery Date simply because the signage had not yet been approved by the City.

Perhaps most importantly, however, Regus's own conduct during the period immediately before it sent the termination notice reflects that both parties understood an affirmative and formal rejection of the permit application by the Planning Department was required under the parties' lease agreement. As described above in detail, Regus's representatives and

23

their agents exchanged multiple, urgent communications with each other and the Planning Department trying to obtain a formal rejection of the permit application in writing prior to sending the rejection notice. Sistrunk, for example, requested over the course of several e-mails: "an official rejection," the "Denial letter of application," a summary of Vornado's efforts "with the city now that [the signage] has been rejected," and repeatedly emphasized that Regus's attorney urgently needed the information about rejection of the permits. Moreover, despite the fact that Regus was unable to obtain an official rejection from the Planning Department, the termination notice it sent expressly states not only that Regus failed to receive "the necessary governmental approvals and permits" for the signage, but that "the applicable governmental authorities *have rejected* [Regus's] request for approval" of the signage. (Italics added.) Berretta, in his testimony, agreed that Regus took the position in its termination notice that the City had rejected the signage application. Thus, the ample evidence of Regus's efforts to obtain a formal or "official" rejection from the City strongly supports an inference that both parties understood Regus had a right to terminate the lease only if the City had rejected the signage permit.

We may also look to industry custom and usage of trade, both to explain the meaning of language in a contract and to imply terms, where no contrary intent appears from the contract. (*Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 889; *Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.* (1988) 205 Cal.App.3d 442, 451 (*Midwest Television*).) In this case, the trial court heard ample evidence about customs and industry standards for approval of signage permits in commercial leases. As the trial court found, "Regus is a frequent applicant for signage permits, regularly engages a national signage firm, and for this project retained a

24

national signage firm who, in turn, retained a local signage firm including a permit expediter." Employees of the signage firm testified in detail about the customs and practices for obtaining signage building permits nationally, while employees of the Planning Department and Vornado's local real estate counsel testified about customs and practices for signage permits in San Francisco. Based on this evidence, the trial court found "three key points: 1) rejection, disapproval, or denial of a signage building permit application occurs in writing by notation on the application; 2) comments and suggestions for changes by municipal agencies during the application process, including comments critical of the application, do not constitute rejection, disapproval or denial of the application; and 3) when a company like[] Regus retains signage specialists including an expediter to obtain approval for desired signage, the application process is pursued until the last 'glimmer of hope' is extinguished."[7] We agree with the trial court that the extensive testimony from multiple witnesses at trial regarding custom and practice, both nationally and locally, with respect to obtaining permits for commercial tenants' signage reflects that the parties would have mutually understood and intended that Regus's right to terminate the contract would depend not on informal feedback from Planning Department officials or suggestions for alternative signage, but on a formal and final denial of the Three Crown

---

[7] In a footnote of its opening brief, Regus criticizes the trial court for failing to "cite the evidence" in support of these findings in its statement of decision. To the contrary, as Vornado points out, the trial court cited multiple sources for these findings. In any event, because Regus does not raise a substantial evidence challenge, it has forfeited any argument regarding sufficiency of the evidence.

Signage.[8]  In the absence of any conflicting evidence, the parties are deemed to have contracted with those customs and practices in mind.  (*Midwest Television*, *supra*, 205 Cal.App.3d at p. 451.)

In sum, the ample extrinsic evidence of circumstances surrounding the making of the agreement, the conduct of the parties subsequent to its execution, and the customs of the industry with respect to signage permits show that the parties mutually intended Regus would have the right to send a termination notice only upon obtaining a formal and definitive rejection from the Planning Department *or* if it had not received an approval of the signage permit *by* (as opposed to any time before) the Delivery Date.

### 3.  *Other Principles of Contract Interpretation*

In addition to the undisputed extrinsic evidence bearing on the parties' intent at the time of contracting, we agree with the trial court that several other general principles of contract interpretation are relevant here.

First, we construe the lease in a manner that is fair and reasonable and does not lead to absurd conclusions.  (Civ. Code, § 1638 [contract to be interpreted consistent with contractual language and to avoid absurdity]; *California National Bank v. Woodbridge Plaza LLC* (2008) 164 Cal.App.4th 137, 143.)  Regus's argument that the Delivery Date Condition should be construed to provide a right to terminate the lease at any time after execution so long as the signage permits were not yet received would lead to absurd results.  As the trial court observed, it would give Regus a virtually unilateral right to terminate the agreement, including on the day after the signing of the agreement before it had even submitted a permit application.

---

[8] Again, this interpretation is particularly compelling in light of the parties' specification in the lease that the informal, "preliminary approval" for the signage was not sufficient under the terms of the lease agreement.

Further, it is undisputed that Vornado was required to and did expend $50 million on renovations for Regus's benefit prior to the Delivery Date. It is unlikely Vornado would have agreed to such substantial improvements if Regus could terminate at any time prior to the Delivery Date.[9]

With respect to the Rejection Condition in the seventh sentence of section 43(A), it is not reasonable that the parties would accept informal comments or suggestions for alternative signage from the Planning Department as a basis for termination of the lease agreement. As discussed, the parties showed by their conduct and the express language of the agreement that something more than informal approval of the signage was required. Given that informal *approval* was not enough to bind Regus to the lease, it follows that informal suggestions for changes from the Planning Department short of a final and binding decision on the permit application would be insufficient to allow Regus to back out of the deal. As the trial court explained, "Based on their decision to eschew 'preliminary' [approval] and to tie their contract rights and obligations to a formal application process, the parties showed their clear intent to base their Lease rights and obligations on the final, definitive and binding result of that process, not preliminary or interim statements."

In addition, the principle that the parties are presumed to know and have in mind all applicable laws when they enter a contract supports our construction of the contractual language here. (Civ. Code, § 1646; see, e.g.,

---

[9] We reject Regus's argument that our interpretation of the Delivery Date Condition would lead to a "draconian" result because it would permit Vornado to control the timing of Regus's termination right under a different provision of the contract that allowed Vornado to extend the Delivery Date. Under our construction of section 43(A), Regus's ability to terminate depends on the *City's* approval or rejection of the permit, not Vornado's actions.

*Miracle Auto Center v. Superior Court* (1998) 68 Cal.App.4th 818, 821 [parties are presumed to know and have had in mind all applicable laws and existing laws are considered part of the contract as if they were expressly referred to and incorporated].)  As the trial court noted, both the Building Code and the City's procedures for appealing permit denials require *written* rejection of permit applications.  (See Cal. Code Regs., tit. 24, § 105.3.1 [building official "shall reject" an application for permit "in writing, stating the reasons therefor"].)  While Regus emphasizes the parties knew how to incorporate these laws in their contract and chose not to, it does not address the express language of the agreement stating that the parties' rights and obligations under the lease "shall be governed, *interpreted*, *construed*, and enforced in accordance with the laws of the State of California."  (Italics added.)  In addition, section 43(A) specifically states that "Tenant's Signage shall be subject to Tenant's receipt of all required governmental permits and approvals and shall be subject to all Applicable Law . . . affecting the Project."

Further, as the trial court found, the " 'same meaning rule' " applies here to help us understand the parties' repetitive use of the phrase "necessary governmental approvals and permits" as it pertains to their intent.  This rule provides that " '[w]ords used in a certain sense in one part of an instrument are deemed to have been used in the same sense in another.' " (*Mirpad, LLC v. California Ins. Guarantee Assn.* (2005) 132 Cal.App.4th 1058, 1069.)  As the trial court explained, the use of the phrase "necessary governmental approvals and permits" (and the nearly identical phrases "required governmental approvals and permits" and "necessary governmental permits and approvals") throughout the agreement, including in almost every sentence of section 43(A), unquestionably refers to the *City's* issuance of a building permit for the Three Crown Signage.

Application of that rule leads to a construction of the seventh sentence that requires the replacement of the phrase "Tenant's rejection" in that sentence with "the City's rejection," and supports a reading that the termination notice could only be delivered following the City's rejection of Regus's permit application.

### 4. Regus's Other Arguments Fail

Regus raises several other arguments we find unpersuasive. It argues we must construe the language of the contract against Vornado because Vornado drafted the language. We reject this argument. " 'Only in those instances where the extrinsic evidence is either lacking or is insufficient to resolve what the parties intended the terms of the contract to mean will the rule that ambiguities are resolved against the drafter of the contract be applied.' " (*Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC* (2020) 53 Cal.App.5th 807, 823; see Civ. Code, § 1654 ["In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."].) For all of the reasons explained above, the undisputed extrinsic evidence of the parties' negotiations leads us to conclude Regus could only terminate the lease before the Delivery Date if the Planning Department formally rejected its application for the signage permit.

Regus also argues we should read the termination as controlled by the sixth sentence as written and disregard the "insensible" words "following Tenant's rejection of the necessary governmental approvals and permits for Tenant's Signage" in the seventh sentence rather than attempt to give them meaning. This suggestion, however, conflicts with the well-established principles that we must strive to construe the contract as a whole, harmonize its provisions, and avoid an interpretation which ignores language the parties

have agreed upon.[10]  (Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."]; *Founding Members*, *supra*, 109 Cal.App.4th at p. 957 ["An interpretation rendering contract language nugatory or inoperative is disfavored."]; *R.W.L. Enterprises v. Oldcastle, Inc.* (2017) 17 Cal.App.5th 1019, 1026 [" ' "An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable." ' "].)  Striking the seventh sentence to give meaning to the sixth sentence in isolation does not harmonize the contractual provisions because it deprives the seventh sentence of all meaning.

---

[10] Nor are we persuaded by Regus's argument that " 'under contract rules[,] the first of two conflicting provisions must prevail over the second.' ([*Estate of Ryan* (1950)] 96 Cal.App.2d [787,] 790; see also *Litten v. Warren* (1936) 11 Cal.App.2d 635, 637 ['[L]ater in the deed the grantor attempted to state what the intention of the parties was, but the intention which it declared is so at variance with the plain unambiguous provisions of the deed that the two cannot be reconciled and therefore the definite and positive provision of the deed must prevail.'].)"  Neither of these cases announce a rule that the court should disregard a second provision in a contract when it conflicts with the first.  The language Regus quotes from *Estate of Ryan* was an argument made by the wife in that case.  The court rejected the argument and construed the subject will in a manner that reconciled the allegedly conflicting provisions, so that each provision was "given effect in accordance with the intentions of the testator as disclosed by the entire will." (*Estate of Ryan*, at p. 791.)  Similarly, in *Litten*, the court disregarded an ambiguous limiting clause that was irreconcilable with the clear and positive intent of the grantor. (*Litten*, at pp. 636–637.)  If any principle from these cases is relevant here, it is that the court must construe the contract consistent with the intent of the parties.  (See, e.g., *City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 243 [the "ultimate interpretative touchstone" is the parties' intent].)

The only word in the seventh sentence that is "insensible" is "Tenant's." If we disregard that word, and replace it, as Regus agrees makes sense, with "the City's," the Rejection Condition reads: "The Termination Notice must be delivered by Tenant to Landlord, if at all, following the City's rejection of the necessary governmental approvals and permits for Tenant's Signage, but no later than the Delivery Date." Such a reading harmonizes the language in the sixth and seventh sentences, and gives meaning to the defined term "Signage Rejection Termination Notice" in the *sixth* sentence. Regus provides no basis for striking the words "rejection of the necessary governmental approvals and permits" from the seventh sentence when it is only the word "Tenant's" that is problematic.

Further, as previously discussed, the undisputed extrinsic evidence, including the text of Regus's own "Signage Rejection Termination Notice," supports an interpretation that the clearly intended meaning of the seventh sentence was that the Planning Department, not Regus, would reject the "necessary governmental approvals and permits." In the termination notice, which expressly relied on the lease and its defined terms, Regus states that the conditions for termination were met because "*the applicable governmental authorities* have rejected [Regus's] request for the approval of [Regus's] Signage." (Italics added.) Regus's argument that the language of the seventh sentence should be rejected when Regus's own termination notice relied on it is specious.[11]

_____

[11] We also find Regus's reliance on *Rabinowitch v. California Western Gas Co.* (1967) 257 Cal.App.2d 150, unavailing. In *Rabinowitch*, the court concluded substantial extrinsic evidence demonstrated that the lessor did *not* agree the contractual provision was to have the effect claimed by the lessee. (*Id.* at p. 158.) Here, as we have explained, the undisputed extrinsic evidence shows that both parties intended Regus would have the right to terminate

Finally, we reject Regus's argument that the plain meaning of the word "rejection" permits us to consider the informal comments and proposals for alternative signage from the Planning Department as rejection of its permit application. Regus argues that there is no indication that the parties used "rejection" in a technical sense. It is abundantly clear, however, that even in an "ordinary and popular sense" a rejection of the "necessary governmental approvals and permits" by the Planning Department would mean a rejection of Regus's application for a permit. (See Civ. Code, § 1644 [words of a contract are to be understood in their ordinary and popular sense].) Moreover, as the trial court here found, the City officials involved in the permit application process testified they never denied the permit application in any sense.

## C. The Trial Court Did Not Reform the Contract

As we have explained above, we independently interpreted the parties' agreement based on the undisputed extrinsic evidence bearing on their intent at the time of contracting and with reference to established principles of contractual interpretation. Because we have concluded that the proper interpretation of the parties' agreement allowed Regus to terminate the lease only if it had either (1) received a formal and final written rejection of the permit application from the Planning Department, or (2) if it had not received approval for the permit application by the Delivery Date, we reject Regus's argument that the trial court erred by reforming the contract. As Regus concedes, Vornado did not seek reformation in its complaint, and there is nothing in the record to support a conclusion that the written contract failed to express the intention of the parties. Rather, for reasons we have explained

the lease before the Delivery Date only if the City rejected its application for the signage permit.

above, the ambiguous language of the sixth and seventh sentences is reasonably susceptible to the meaning ascribed by Vornado, and all of the undisputed extrinsic evidence and relevant principles of contractual interpretation support that interpretation. Accordingly, there was no reason for the trial court to reform the contract. (See, e.g., *Matter of Beverly Hills Bancorp* (9th Cir. 1981) 649 F.2d 1329, 1333–1334.)

Likewise, we reject Regus's argument that the trial court's costs award in favor of Vornado should be reversed.

### III. DISPOSITION

The judgment is affirmed. Vornado is entitled to costs on appeal.

MARGULIES, J.

WE CONCUR:


HUMES, P. J.


DEVINE, J.*


A163137
*HWA 555 Owners, LLC v. RGN-San Francisco XXIV, LLC*

---

\* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.